Filed 9/20/22  P. v. Herrera CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. LOUIE SANTILLAN HERRERA, Defendant and Appellant. | D078275 (Super. Ct. No. SCN382146) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed in part, sentence vacated and remanded for resentencing.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Steve Oetting, Robin Urbanski, Acting Assistant Attorneys General, Arlene A. Sevidal and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Louis Santillan Herrera molested his stepdaughter, Jane Doe,[1] over the course of several years, when Jane was approximately 7 to 10 years old. When Jane disclosed the abuse to her mother, her mother left Herrera and moved to France with Jane. Upon learning of the abuse, Jane's father (who is a French citizen and lived in France) reported the abuse to the French authorities who initiated a prosecution against Herrera in France. Jane's father also reported the abuse to law enforcement in San Diego County, but the prosecutor here declined to pursue the case since there was already an active case in France. Herrera was found guilty in absentia by "default judgment" in France, but was never arrested or extradited to France. Jane eventually returned to the United States, and she reported the abuse. This time, the prosecutor charged Herrera in San Diego County, and a jury convicted Herrera on 12 counts of sex crimes against a minor.

Herrera asserts his state and federal rights to due process and a fair trial were violated by the 12- to 15-year delay between the alleged molestation and his prosecution in the United States. He further asserts the trial court erred by allowing an expert to testify about common misconceptions of how children report sexual abuse, and its limiting instruction on the jury's permissible use of that testimony misstated the law. We find no error. But, as the Attorney General concedes, we must remand the matter for resentencing under the ameliorative sentencing provisions of recently enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567). We affirm the judgment in all other respects.

---

[1]    Pursuant to rule 8.90(b)(4) of the California Rules of Court, we use an anonymous first name and surname to protect the identity of the victims.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.

### *The Sexual Abuse*

Before Jane, Herrera molested his own daughter, Janice Doe, starting when Janice was approximately 10 years old. Herrera would put a blanket over Janice and touch her vagina while she sat with him in a recliner, watching television. This happened "multiple times." Herrera would also touch his penis while looking at Janice in the shower, and would tell her "that he would want [her] to do that to him." Janice recalled waking up with Herrera "over" her and touching her. Janice moved out of the house when she was 16. At the time, she did not tell anyone about Herrera's abuse because she felt guilty, ashamed, and embarrassed.

Nearly 15 years later, Herrera married Jane's mother in September 2003. Jane was about 7 years old. Jane and her mother had been living in a trailer park, and Herrera moved into the trailer with them after the wedding. Shortly after, Herrera started molesting Jane. In the first instance of abuse that Jane recalled, she woke up in the bed in the master bedroom, where Herrera and her mother usually slept. Jane was naked. Her mother was not there. Herrera had his head between Jane's thighs and was licking her vagina. He looked up at Jane and smiled. Jane was paralyzed with fear. She could feel everything, but could not move or speak.

The sexual abuse continued for the next two to three years. Jane did not tell anyone what was happening because she, too, was ashamed. When Jane was 8 or 9 years old, Herrera undressed her and took her into the shower. Herrera was also naked. He held Jane in front of him, so that Jane was facing him and her legs were wrapped around his back. Herrera placed his erect penis "in the fold of [Jane's] vagina." When they got out of the

3

shower, Herrera asked Jane to kiss his penis. Herrera said, "[k]iss it," and Jane said "no." But Herrera kept "begging," so Jane "pecked his penis" with her mouth, and ran out of the room.

Other times, Herrera penetrated Jane's vagina with a foreign object on the bed in the master bedroom. Jane recalled this happening repeatedly. Herrera would place Jane on her stomach, with a pillow beneath her hips, and would penetrate her vagina with either his fingers, the tip of his penis, or an object. Jane was not sure what Herrera used because she was always facing away from him. Herrera would ask Jane if it felt good. When she said no, he would "keep pushing harder." Other times Herrera would lay on top of Jane and "move his body up and down so he was essentially caressing [her] vagina with his penis." Herrera would also place Jane's hand on his erect penis and show her how to masturbate him.

Most of the sexual abuse occurred in the shower or the master bedroom. But "multiple times," Herrera went into Jane's bedroom as she was falling asleep and "force[d] [her] to make out with him to the point that [she] couldn't breathe." One time, Herrera touched Jane's vagina over her clothing while they were riding in the car together. Another time, Herrera was sitting on a chair near the kitchen. Jane's mother walked through the kitchen and saw Jane touching Herrera's penis. Herrera did not do anything to stop Jane. He had "the most hideous, evil smile on his face." Jane's mother was shocked. She told Jane to go to her room and asked Herrera why he did not stop Jane from touching him.[2] She could not remember Herrera's response, or anything else that occurred after that.

---

[2]    Jane's mother could not recall if she saw Jane touching Herrera's penis before or after the pool incident.

Jane disclosed the sexual abuse to her mother around her 10th birthday. She had a birthday party at the trailer park pool. Herrera got in the pool while Jane's friends were in the deep end, playing a game. Herrera put his arm around Jane's waist, held her firmly against his chest, placed his hand in her bathing suit and penetrated her vagina with his fingers. After, Jane thought "[she] was going to die if it happened to [her] one more time." She told her mother, "he has been touching me." Jane's mother "broke down" and confronted Herrera. He denied the abuse and said she and Jane were "crazy." Jane's mother began planning to leave Herrera, and the country. Approximately two months later, she and Jane went to live with Jane's maternal grandmother in France.[3]

## II.

### *Prosecution in France*

After arriving in France, Jane told a friend about Herrera's sexual abuse. The friend told Jane's father, who was also in France at the time, and Jane's father reported the abuse to the French authorities. In April 2008, Herrera was indicted in France for sexual assault of a minor.

That same month, Jane's father reported the abuse to the San Diego County Sheriff's Department. He also sent the Sheriff's Department some documents from the French proceedings. The Sheriff's Department gave the information to the San Diego County District Attorney's Office, and a deputy district attorney contacted the Justice Attaché in the American Embassy in France.[4] The Justice Attaché confirmed France had jurisdiction and was

---

[3] Jane's mother and father are both citizens of France. Although Jane was born in the United States, she is considered a French national by parentage.

[4] A Justice Attaché is a legal liaison responsible for handling extradition

prosecuting the case against Herrera. The Sheriff's Department and the District Attorney agreed it would be best to allow the French authorities to handle the matter since Jane and her father were both living in France.

Herrera was not notified of the charges and did not appear in court in France. In April 2010, the High Court of Paris issued a "default ruling" against Herrera, finding him guilty of sexual assault of a minor under the age of 15 by a person of authority.[5] The French court sentenced Herrera to one year in prison and issued a warrant for his arrest. France did not request extradition of Herrera from the United States, and the arrest warrant eventually expired.

## III.

### *Prosecution in the United States*

Jane eventually moved back to the United States. She felt she had to do something about Herrera's sexual abuse, in part because she knew Herrera had two grandchildren. So, in October 2017, Jane contacted the San Diego County Sheriff's Department to report the abuse herself. The Sheriff's detective assigned to the case interviewed Jane and asked her to conduct a pretext call with Herrera. Jane agreed and made the call the following month.

Jane began by explaining to Herrera that she was in therapy but was having trouble in her relationship and needed his help to understand what

---

requests, mutual legal assistance requests, and other matters between the United States, France and other assigned countries in the region.

[5] They judgment states, "In the absence of the appearance of Louis HERRERA, noting that the citation has not been delivered to the privy and that it has not been established that the latter had knowledge about it, it is applicable to rule by default against him, pursuant to the provisions of Article 412 of the Code of Criminal Procedure." (Italics omitted.)

6

had happened between them.  Herrera did not deny that something had happened, but said he did not think it was a good idea to talk about it.  Jane persisted.  She told him she did not really remember everything and wanted to "understand how it even started."  Herrera responded:  "Well, it started because of the way your mom was. . . . we were always naked.  Running around naked in the house, sleeping naked, . . .  rubbing up against each other.  When we were sleeping, . . .  you used to touch me, so I touched you, and that's how it started.  But you know, it's not like I had, you know, intercourse with you.  I never did that."

Jane asked Herrera if he was blaming her, or her mother, and Herrera said, "it was just the situation was there," but it was a "good thing it didn't last long."  Jane asked, "You don't think two years is a long time?" Herrera responded, "[w]ell, it all depends on how you look at it, and who's looking at it."  He continued, "I apologize that, that you don't feel good about it."  Jane said there was "a lot of pain that comes with it" and "a lot of questioning." Herrera explained further and told Jane she "used to lay on the floor naked with [her] legs open" and he "could see everything" and thought, "wow, this is happening, you know?"  Herrera told Jane there was an incident when they were naked in the kitchen and he started to get an erection.  He told Jane she "went over" and "put [her] hands on it" and was "playing with it" with her "mom just looking, not saying anything."  So he "figured, well, I guess that's part of what's gonna happen, you know?"

Towards the end of the call, Jane said, "I have, uh, you know, Louie, when we've touched each other's genitals. . . .  That actually happened.  So I'm not making this up.  If I have PTSD about those events, they—they're real.  Don't you think?"  Herrera responded, "Well, I don't—I don't doubt you at all.  I believe what you're telling me."  Still, he denied having ever put his

7

fingers, or anything else, inside Jane's vagina. Instead, he told Jane, "I only touched you on the outside," and, "I was afraid that you would lose your virginity, and I didn't want that."

After the pretext call, the detective went to Herrera's home to question him about the allegations. Herrera then sent Jane a text message telling her, "You bitch. You tried to trap me." In a complaint filed in San Diego County in January 2018, the San Diego County District Attorney's Office charged Herrera with two counts of oral copulation of a person under 14 (Pen. Code,[6] § 288a, subd. (c)(1); counts 1, 3); two counts of sexual penetration by a foreign object (§ 289, subd. (j); counts 5, 7); and eight counts of lewd act upon a child (§ 288(a); counts 2, 4, 6, 8–12).

After Herrera was arraigned, Janice's mother contacted the San Diego County Sheriff's Department to report Herrera had also molested Janice. Janice provided a statement to law enforcement and agreed to participate in a pretext call with Herrera. During the call, Herrera tried to dissuade Janice from testifying. He told Janice, "[t]he attorney told me . . . if we go to court and you testify, they'll probably put me in jail." Herrera continued, "I don't think you love me like the way you say you do. And then when you said you forgave me, I don't think you did because when you forgive somebody, they never mention it again." Janice told Herrera that testifying about what happened did not mean she did not forgive him, and stated, "its awful dad because of what happened to me." As with Jane, Herrera did not deny the abuse. He responded, "Okay well let[']s try to forget all of that . . . It's negative and I don't want to talk about it anymore." In a follow-up pretext call, Herrera told Janice: "[W]hen they ask you a question all you gotta say

---

6    All further unspecified statutory references are to the Penal Code.

is, I stand on my [fifth] amendment right against self-incrimination. Every time they ask you a question just say that. They'll stop asking you and they'll excuse you."

Jane and Janice testified against Herrera at trial, and the prosecution played all three pretext calls for the jury. The prosecution also presented testimony from Jane's mother, the detective assigned to the case, and an expert on the disclosure of sexual abuse by children.[7] Herrera did not present any evidence on his behalf. The jury convicted Herrera on all 12 counts, and the trial court sentenced him to 22 years in prison.

DISCUSSION

I.

*The Trial Court Did Not Err By Denying Herrera's Motion to Dismiss the Case Based on Delayed Prosecution*

Herrera asserts the 12- to 15-year delay between the alleged acts of sexual abuse and the filing of charges against him in San Diego County violated both his federal and state rights to due process and a fair trial, and the trial court erred by denying his motion to dismiss the charges based on prosecutorial delay.

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430.) But even a lengthy delay is not sufficient, on its own, to establish a due process violation warranting dismissal of the charges. "A defendant seeking to

---

[7] We later discuss the expert's testimony in more detail.

dismiss a charge on this ground must demonstrate prejudice arising from the delay." (*People v. Catlin* (2001) 26 Cal.4th 81, 107 (*Catlin*).) If the defendant is able to do so, "[t]he prosecution may offer justification for the delay." (*Ibid*.) The court considering a motion to dismiss based on prosecutorial delay then "balances the harm to the defendant against the justification for the delay." (*Ibid*.) On appeal, we review the trial court's ruling for an abuse of discretion, and defer to any underlying factual findings made by the trial court so long as they are supported by substantial evidence. (*Cowan,* at p. 431.)

Here, the trial court concluded Herrera had not demonstrated the delay caused any actual prejudice, or that it was undertaken for a tactical advantage. So it denied the motion to dismiss. We conclude substantial evidence supports the trial court's findings, and we find no abuse of discretion in the trial court's balancing of the alleged prejudice against the alleged justification.

A.     *Herrera Did Not Suffer Actual Prejudice*

Even where the delay is lengthy, prejudice is not presumed. (See *People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) As Herrera himself acknowledges, "[a] defendant must show *actual* prejudice based on the facts of the case." (*People v. Hartman* (1985) 170 Cal.App.3d 572, 579 (*Hartman*).) "The showing of actual prejudice which the law requires must be supported by particular facts and not . . . by bare conclusionary statements." (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442 (*Crockett*).) As our high court has observed, " '[p]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*Catlin, supra,* 26 Cal.4th at p. 107.)

Herrera's claims of prejudice, both in the trial court and on appeal, fall into four basic categories. He claims there is: (1) the fading memory of Herrera and Jane's mother; (2) the loss of records from the French investigation; (3) the loss of witnesses from the trailer park and Jane's school; and (4) the prosecution's ability to gain corroborating evidence, with the additional time, in the form of Janice's statement and the three pretext calls with Herrera. Herrera has not, however, established he was *actually* prejudiced by any of these asserted reasons. His claims are speculative, and insufficient to support a finding of prejudice from the delay. (See *People v. Jones* (2013) 57 Cal.4th 899, 923–924 [finding speculative evidence of prejudice insufficient]; accord *Crockett, supra,* 14 Cal.3d at p. 442.)

First, Herrera has not established his recollection of the abuse was any better in 2008, when Jane's father first reported the abuse to the San Diego County Sheriff's Department. Herrera did not testify at trial. And in the pretext call with Jane that was played for the jury, Herrera admitted he touched Jane, and Jane touched him, but said he did not "remember" certain other events. His alleged lack of memory was directly tied to his denial of certain, specific allegations. When Jane described waking up on the bed with Herrera's head between her legs, Herrera first said, "I don't remember doing that," but then clarified, "No, I don't think that's true." Similarly, Herrera claimed he did not remember penetrating Jane's vagina, but also went on to explain that he would not do that because he did not want her to lose her virginity. Herrera never gave any indication he could not remember because of any lapse of time.

Nor did Jane's mother. She testified she did not know where she was when the abuse occurred, and that she would always be troubled by that fact. But even in 2008, Jane's mother said she did not remember leaving Jane

11

alone with Herrera, and neither she nor Jane knew where she was when the abuse occurred. She testified further that seeing Jane touching Herrera's penis "was so shocking," her memory was "blank," and she had "no idea what happened" after she confronted Herrera  Any claim that Herrera or Jane's mother would have remembered more in 2008 is purely speculative.[8] (See *Jones, supra,* 57 Cal.4th at pp. 923–924.)

Second, Herrera asserts he was prejudiced because "the reports of police interviews, psychological interviews and any other statements made at the time of the French prosecution were no longer available."  Again, any assertion that evidence would have aided in his defense is also speculative, at best.  The reports the prosecutor did obtain from the investigation in France were consistent with Jane and her mother's testimony at trial in this case. And according to the default judgment from France, the psychological expert who interviewed Jane found "her statement of the facts was spontaneous, fluid, well-documented, and free of confusion. Her statement was authentic. He did not notice any tendencies for fabrication or staging of facts." Thus, if anything, any additional records from France likely would have corroborated Jane's story.

Herrera also asserts he was not able to obtain the results of the physical examination of Jane but, again, any suggestion the results would have been helpful to the defense is purely speculative.  Jane was not examined until after she disclosed the abuse to a friend in France, months after the last reported instance of abuse.  At trial, the Sheriff's detective

---

[8]    Herrera relies on *People v. Hill* (1984) 37 Cal.3d 491 but there, unlike here, there was evidence the witnesses' memories had "*developed* significant gaps" over time, and, even then, the Court noted the witnesses' faded memories may have benefited the defendant.  (*Id.* at p. 498, italics added.)

assigned to Jane's case testified the timetable for collecting forensic evidence in these types of cases was three to five days after the last instance of abuse. Herrera has not established there is any reason to believe the physical examination in France yielded any useful information, to either the prosecution or the defense.

Third, Herrera's claims that he was prejudiced because he could not locate witnesses from the pool party or Jane's school fail for two reasons. One, there was no evidence Herrera *tried* to find any of those witnesses. (See *Jones, supra,* 57 Cal.4th at p. 923 [noting defense investigator's declaration did not state he attempted to locate missing witnesses, or that he was unsuccessful].) Herrera asserts the trailer park where he and Jane lived at the time of the abuse burned down, but he does not explain how this fact prevented him from determining what other children were at the pool party. Indeed, during her testimony at trial, Jane noted that several of the party attendees were in the courtroom audience. Notably, Herrera does not assert Jane, or the prosecution, withheld the identity of those individuals before trial. Herrera also does not assert that he did not know what school Jane attended, or what teachers she had, during the relevant years in 2003 to 2006.

Herrera has not established these additional witnesses would have been helpful to his defense. Without the testimony of any pool party guests, the jury was left to infer that no one saw Herrera touching Jane. As the trial court pointed out, although brazen, it was possible that Herrera could have touched Jane in the pool, as she alleged, without anyone seeing. But, if anything, that inference supported the defense. And teachers from Jane's elementary school may have corroborated her testimony that she was disconnected and upset at school. Bald assertions of missing witnesses are

13

not sufficient, without more, to establish prejudice. (See *Jones, supra,* 57 Cal.4th at p. 923; *Crocket, supra,* 14 Cal.3d at p. 442.)

Fourth and last, Herrera's assertions that Janice would not have come forward, or that Jane or Janice would not have made the pretext calls in 2008, is also speculative.[9] Although Jane was only 10 years old in 2008, she still could have participated in a pretext call with Herrera. (See *In re A.M.* (2019) 37 cal.App.5th 614, 617 [noting minor made two pretext calls and sent a pretext text message to father regarding sexual abuse].) Or, as the prosecutor suggested at trial, Jane's mother could have made the pretext call based on the allegations of abuse that Jane had reported to her. And, unlike Jane, Janice was an adult over 30 years old in 2008. She voluntarily came forward and agreed to participate in the pretext calls after she heard Herrera was indicted for molesting Jane. There is no reason to believe Janice would not have done the same if Herrera had been charged in 2008, instead of 2017.

Regardless, Herrera presents no authority to suggest the development of *additional inculpatory evidence* amounts to prejudice based on prosecutorial delay. To the contrary, a lack of sufficient evidence is one reasonable justification *for* prosecutorial delay. (See *Nelson, supra,* 43 Cal.4th at p. 1256 ["A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges."].) On this record, substantial evidence supports the trial court's finding that Herrera failed to demonstrate he was actually prejudiced by the delay.

---

9    Herrera asserts it is speculative whether the same evidence could have been obtained through a pretext call in 2008, but it is Herrera's burden to establish prejudice in the first instance. (See *Catlin, supra,* 26 Cal.4th at p. 107.)

14

B.    *The Delay Was Justified*

Even if there was some minimal prejudice to Herrera as a result of the delayed prosecution, substantial evidence also supports the trial court's finding that the delay was justified.

"The state and federal constitutional standards regarding what justifies delay differ." (*Jones, supra,* 43 Cal.4th at p. 1251.)  "A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant." (*Catlin, supra,* 26 Cal.4th at p. 107.)  "[U]nder California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process.  This does not mean, however, that whether the delay was purposeful or negligent is irrelevant." (*Nelson, supra*, 43 Cal.4th at p. 1255.)  Instead, "whether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id*. at p. 1256.)

Here, the delay was neither negligent nor purposeful, at least not in the sense that it was undertaken to gain a tactical advantage.  The Sheriff's Department and the District Attorney expressly declined to pursue the matter in 2008, not to gain some advantage, but because the French authorities were already pursuing an investigation in France, where Jane and her father were both living at the time.  Neither the Sheriff's Department nor the District Attorney had any way to know that France would not pursue the arrest or extradition of Herrera from the United

15

States.[10] Quite the opposite. The Sheriff's deputy assigned to the case in 2008 told Jane's father he would assist in the arrest and extradition of Herrera, if necessary. Nor did the Sheriff's Department or the District Attorney have any reason to believe Jane would return to the United States years later, or that she, herself, would pursue the case once she did. Contrary to Herrera's assertions, there was no reason for the Sheriff's Department to obtain documentation or evidence from France, or to seek out additional witnesses to corroborate Jane's claims. As our high court explained, "[i]t is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra,* 43 Cal.4th at p. 1257.)

In sum, we conclude substantial evidence supports the trial court's findings that Herrera did not suffer actual prejudice as a result of the delay, and that the delay was not tactical. Even if there was some minimal prejudice caused by the delay, it was outweighed by the justification for the delay. Thus, the trial court did not abuse its discretion by concluding dismissal was not warranted. For the same reasons, we conclude Herrera's state and federal constitutional rights were not violated by the delay.

---

10    In December 2008, the deputy district attorney informed the Sheriff's Department there was a valid international arrest warrant for Herrera, but "in order to pursue the arrest of the suspect in the United States, an official request from the French Government to the Unites States Government would be required."

## II.

*The Trial Court Did Not Err by Admitting Expert Testimony On Common Misconceptions About the Disclosure of Sexual Abuse by Children*

The jury heard expert testimony from Christina Shultz[11] about "the myths and misconceptions surrounding" the disclosure of sexual abuse by children. Herrera contends the testimony was inadmissible because it was unreliable under the *Kelly/Frye*[12] rule, it was irrelevant, and it was based on inadmissible hearsay. He further contends the trial court's instruction to the jury on the limited purpose of the testimony misstated the law. We find no merit to these claims.

A.  *Shultz's Testimony Was Properly Admitted*

Expert testimony to explain the behavior of child abuse victims, often known as child sexual abuse accommodation syndrome (CSAAS), has long been held admissible in California for limited purposes. As our high court observed in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), California Courts of Appeal have held that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused[, but] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id*. at pp. 1300–1301, citing *People*

---

11    At the time of trial, Shultz was a supervisor and forensic interviewer for the Palomar Forensic Health Services Child Advocacy Program. She had conducted over 2,000 forensic interviews, a large number of which dealt with sexual abuse of a child.

12    *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*).

*v. Bowker* (1988) 203 Cal.App.3d 385, 390–394, review den. Nov. 10, 1988, *People v. Gray* (1986) 187 Cal.App.3d 213, 217–220, review den. Mar. 5, 1987, *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1097–1100.) Relying on those "series of decisions" from the Courts of Appeal, our high court held expert testimony regarding delayed disclosures by parents of abused children was similarly admissible. (*McAlpin*, at pp. 1300–1301.) In doing so, the *McAlpin* court explained, expert testimony regarding the disclosure of sexual abuse by children " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id.* at p. 1301.)

Here, Shultz testified, "[i]n my clinical experience with the children that I interview, the vast majority have disclosed in a delayed fashion." She explained delayed disclosure is "also substantiated in research," and is more common in cases where the child is abused by someone they have a close relationship with. Further, children often disclose sexual abuse incrementally, over time. Shultz explained there is often an element of secrecy around the abuse. The victim might feel shame or embarrassment, or may fear there will be consequences associated with disclosing the abuse. Finally, she explained that children might remember core details—such as the physical acts of abuse that occurred—but forget peripheral details—such as what someone was wearing.[13]

---

[13] Although Schultz's testimony was not explicitly about CSAAS, her opinions were consistent with CSAAS research. (See *Bowker*, *supra*, 203 Cal.App.3d at p. 389 & fn. 3 [first articulated in 1983, CSAAS has five stages—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction].)

Shultz told the jury she had not spoken with Jane, had not reviewed any police reports specific to Jane's case, and was not there to "speak to any facts of this case or any victim in this case." She also testified that, absent physical evidence, there is no way to look at a child and determine whether they had been abused, or whether they were telling the truth about an allegation of abuse. Although some children display certain behavioral responses to the abuse, others are able to continue "to present very, what people would call, normal."

Although California courts routinely admit expert testimony like the testimony offered by Shultz for the limited purpose of rebutting attacks on the victim's credibility based on delayed reporting (see e.g., *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069, quoting *People v. Stark* (1989) 213 Cal.App.3d 107, 116 ["such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse"]; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 [acknowledging "recent precedent" that such testimony is admissible to rehabilitate the victim and citing cases]), Herrera asserts the Court's statements regarding the admissibility of CSAAS evidence in *McAlpin* were dicta, and are not controlling. He asks us to reject the well-settled rule that such evidence is admissible because, he asserts, it does not meet the reliability standards of the *Kelly/Frye* rule, the public no longer has any misconceptions about how children report sexual abuse, and it is largely based on hearsay. Our sister court recently rejected many of these same arguments in *Munch*, and concluded, instead, that *McAlpine* "is binding on all lower courts in this state." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*) review den. Oct. 14, 2020, S264138, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["all tribunals exercising inferior jurisdiction are

19

required to follow decisions of courts exercising superior jurisdiction"].)
Notably, the California Supreme Court denied the defendant's petition for review in *Munch*. (See *Munch,* at p. 464.)

Here, too, we decline Herrera's invitation to depart from our high court's analysis in *McAlpin*, and the long line of cases since holding expert testimony regarding the disclosure of sexual abuse by children is admissible for the limited purpose of rehabilitation of a victim's credibility. (See e.g., *Munch, supra,* 52 Cal.App.5th at p. 468.)

1.      *The Kelly-Frye Test Is Not Applicable*

First, we conclude, as the court did in *Munch*, that the *Kelly/Frye* test is not applicable to the type of expert testimony offered by Shultz. (*Munch, supra,* 52 Cal.App.5th at p. 472.) As the *Munch* court explained, " '[u]nder the *Kelly/Frye* test, when expert testimony based on a new scientific technique is offered, the proponent of the testimony must first establish the reliability of the method and the qualifications of the witness.' " (*Ibid*.) The *Kelly/Frye* test applies when the expert testimony "is based, in whole or part, on a technique, process, or theory which is *new* to science" *and* "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*).) "The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Ibid*.) But, where "[t]he methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility," the *Kelly/Frye* test is inapplicable. (*Id*. at p. 1157.)

Here, "we are not dealing with new *experimental scientific* evidence." (*Munch, supra,* 52 Cal.App.5th at p. 472, original italics omitted, italics

20

added.) As in *Munch*, "[t]he expert testimony here is 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area." (*Id*. at p. 473.) "[C]ourts have long recognized the well-established relevance, necessity, reliability, and importance of this evidence." (*Id*. at p. 472.) Further, this is not the type of evidence that carries a "misleading aura of scientific infallibility." (See *Stoll, supra,* 49 Cal.3d at p. 1156.) Rather, it "meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' " (*Munch*, at p. 473, quoting *Stoll*, at p. 1161.)

Herrera asserts other courts have found expert testimony regarding CSAAS inadmissible based on the *Kelly/Frye* test, but in each of those cases the experts were relying on characteristics of the syndrome itself to prove the abuse actually occurred. (See *In re Sara M.* (1987) 194 Cal.App.3d 585, 591 ["The instant case does not involve the rehabilitation of the victim's credibility; the prosecution offered testimony concerning the child molest syndrome in its case-in-chief."]; *In re Amber M.* (1987) 191 Cal.App.3d 682, 686 [challenging expert testimony "that Amber had been molested"]; *In re Christine C.* (1987) 191 Cal.App.3d 676, 679 [challenging expert testimony analyzing the child's behavior and reporting "to detect sexual abuse"]; see also *Bowker*, *supra*, 203 Cal.App.3d at p. 392 ["numerous Court of Appeal decisions have held that *Kelly-Frye* similarly precludes an expert from testifying based on [CSAAS] that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children"].) Reliance on purported characteristics of a defined syndrome to *prove* that a child was actually

molested is the type of expert testimony that may mislead a jury based on an "aura of scientific infallibility." (See *Stoll, supra,* 49 Cal.3d at p. 1156.)

But, as another panel of this court has previously explained, an expert does not need to rely on the characteristics of the syndrome itself, or opine that the alleged victim has exhibited those characteristics, "to testify [more generally] that a particular type of behavior is not inconsistent with a child having been abused." (*Bowker, supra*, 203 Cal.App.3d at p. 392, fn. 8.) Where, as here, an expert testifies about common misconceptions of how children report sexual abuse based on their own professional experience, and without reference to or diagnosis of a defined syndrome, the testimony is not likely to mislead the jury based on an aura of scientific infallibility, and is not subject to the " 'additional screening procedures' " of the *Kelly/Frye* test. (See *Munch, supra,* 52 Cal.App.5th at p. 473, quoting *Stoll, supra,* 49 Cal.3d at p. 1161; accord *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450 [discussing *Bowker* and finding expert testimony regarding misconceptions about victims' behavior was admissible to rebut questions of credibility].)[14]

Herrera further asserts the holding in *Munch* "ignores the modern avalanche of data and judicial opinion that CSAAS is not reliable." This argument fails for several reasons. First, the court in *Munch* considered, and rejected, a similar argument. Munch observed that "several jurisdictions have decided to no longer admit CSAAS evidence because they have discovered its deficiencies." (*Munch, supra,* 52 Cal.App.5th at p. 469.)

_____

[14]  Herrera asserts this court should not follow *Bowker* or *Harlan*, but both are among the "series of decision [by] the Courts of Appeal" the Court relied upon in *McAlpin* and, as we have discussed, *McAlpin* is binding on this court. (See *McAlpin, supra,* 53 Cal.3d at p. 1300.) We also see no reason to depart from *Bowker* or *Harlan* on this point.

Rejecting many of the same authorities that Herrera relies on here, the *Munch* court concluded, although there is a "tiny minority of jurisdictions that do not recognize" this type of evidence, "the vast majority of jurisdictions . . . have rendered decisions that are consistent with *McAlpin*." (*Id.* at p. 472.) Second, the authorities Herrera present are far from a "modern avalanche of data" criticizing CSAAS. As the court in *Munch* explained, the literature criticizing CSAAS has been challenged, and ample authority remains to support the theory. (*Id.* at pp. 470–471.)

Third, the majority of the criticism Herrera raises is aimed at the *diagnostic* reliability of CSAAS. But, as we have just explained, Shultz did not discuss or rely upon the syndrome itself in this case, nor did she make any diagnosis based on the syndrome. Shultz relied primarily on her own experience gained from conducting forensic interviews of sexually abused children, and her own expert view of the relevant literature, to discuss the ways in which children tend to disclose abuse. Defense counsel was provided an opportunity to cross-examine Shultz as to the reliability of, or the basis for, those opinions. (See *Munch, supra,* 52 Cal.App.5th at p. 473 ["The subject matter of this testimony may be challenged by examining the source materials and studies on which the expert relies."].)

2. *The Testimony Was Relevant*

Next, we reject Herrera's assertion that Shultz's opinions were not admissible because they were not "[r]elated to a subject that is sufficiently beyond [the] common experience" of the jurors, as required by Evidence Code section 801. (Evid. Code § 801.) Herrera acknowledges such testimony may have been necessary to disabuse jurors of commonly held misconceptions about child sexual abuse when *McAlpin* was decided, but asserts "those misconceptions do not exist in today's society." He argues "the general public

23

is now well aware that children who suffer sexual abuse may not report that abuse for years, and may not do so consistently." This assertion is based on pure speculation.

Herrera attempts to support the assertion with a handful of examples of media coverage of high-profile child sex abuse scandals, but he does not provide any evidence establishing the effect of these stories on the general public, specifically what is (or is not) in the public's common fund of knowledge. The mere existence of media coverage of allegations of child sex abuse does not equate to widespread public knowledge of those allegations, let alone the common *misconceptions* about the *way* in which children report such abuse. The examples Herrera provide are primarily about the abuse itself. They do not focus on the reasons a child may delay disclosing the abuse, or any other misconceptions about children's disclosure of sex abuse.

Herrera also relies on cases from two other states. This authority is not controlling on this court, nor is it persuasive. Herrera asserts the Pennsylvania Supreme Court found expert testimony is not necessary to explain the reasons children delay reporting sexual abuse. (See *People v. Dunkle* (Penn. 1992) 529 Pa. 168, 181–182.) But as the court in *Munch* explained, "after the *Dunkle* decision, the Pennsylvania Legislature passed a law 'providing for the admissibility of this type of expert testimony.' " (*Munch, supra,* 52 Cal.App.5th at p. 469.) And, as the court in *Munch* concluded, the vast majority of jurisdictions have found the type of testimony offered by Shultz to be relevant and admissible. (*Id*. at p. 469.)

Finally, Herrera relies on the responses of certain *prospective jurors in the venire* during voir dire to assert the jurors *seated* in this case did not hold the common misconceptions Shultz addressed. He points out that some of the prospective jurors disclosed prior experiences with child sex abuse, or

allegations of child sex abuse, but he fails to even explain what those experiences would have to do with the jurors who were actually empaneled to hear his case, let alone with their knowledge of common misconceptions of how children disclose sexual abuse. We fail to see the connection. Regardless, the individual members of the jury do not need to "be wholly ignorant of the opinion's subject matter for it to be admissible." (See *People v. Rodriguez* (2014) 58 Cal.4th 587, 639; see also Evid. Code, § 801 [expert testimony is admissible if the subject matter is "sufficiently beyond *common experience*"], italics added.)

3. *The Testimony Was Not Based on Inadmissible Hearsay*

Finally, Herrera asserts Shultz's testimony was inadmissible because it was based largely on hearsay. This argument fails as well. Herrera relies solely on *People v. Sanchez* (2016) 63 Cal.4th 665, in which the California Supreme Court held: "When any expert relates to the jury *case-specific out-of-court statements*, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Id.* at p. 686, italics added.) *Sanchez* addressed testimony from a gang expert, and the case-specific out-of-court statements at issue related to "the expert's description of defendant's past contacts with police." (*Id.* at p. 674.) Here, by contrast, Shultz explicitly testified she had not spoken with Jane, had not reviewed any police reports specific to her case, and was not there to "speak to any facts of this case or any victim in this case." She did not relate any case-specific out-of-court statements to the jury. As an expert, Shultz was entitled to rely on her own personal knowledge, and the general knowledge she gained through her training and experience. (*Id.* at p. 675.) *Sanchez* does not hold otherwise and is simply inapposite. (*Ibid.*)

25

4. *Any Error In Admitting the Testimony was Harmless*

For the reasons stated, we conclude the trial court did not err by allowing Shultz to testify regarding common misconceptions about the way children report sexual abuse. But, even if we were to assume the admission of the evidence was error, the error was harmless.

"Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.) Here, Herrera asserts the admission of the evidence violated his federal constitutional rights and so prejudice must be assessed under the more stringent federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). For the reasons already discussed, we disagree the alleged error violated Herrera's federal constitutional rights. Regardless, we would find the error harmless under either standard.

The evidence of guilt in this case was overwhelming. Jane's testimony, alone, was compelling evidence sufficient to convict Herrera. That testimony was also corroborated by Jane's pretext call with Herrera, in which he *admitted* much of the abuse, and by Janice's testimony, from which the jury was entitled to infer that Herrera "had a propensity to commit such crimes, which in turn may show that he committed the charged offenses" involving Jane. (*People v. Falsetta* (1999) 21 Cal.4th 903, 923; Evid. Code, § 1108.)

Herrera asserts there were inconsistencies in Jane's story, but most of the inconsistencies concerned the exact number of times or the exact dates on which the abuse occurred, and not the details of the abuse itself. It is not improbable that a child under the age of 10 would have difficult identifying

26

the exact date, or number of times, any event occurred. Herrera asserts further that Jane's mother could not explain where she was when the abuse occurred, and neither she nor any of the other children at Jane's birthday party witnessed Herrera touching Jane in the pool. But Jane's mother did testify that she was aware Herrera showered with Jane on at least one occasion, that Jane sometimes slept in the bed with her and Herrera, and that Jane was often naked around the house. She did not think there was anything wrong with that, because she "trusted the man [she] married." Further, as the trial court pointed out, it was possible that Herrera touched Jane in the pool, as she alleged, without anyone else noticing what was happening. The jury was entitled to weigh all of the evidence, including both Herrera's admissions and the lack of direct witnesses to the abuse, and credit the prosecution's evidence.

Herrera contends Shultz's testimony "gave the jury reason to discount the indicia of falsity that might have led at least one jury to doubt" the allegations. But, as we have already explained, the type of expert opinion Shultz offered is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra,* 53 Cal.3d at p. 1301.) Further, Shultz clarified she had not spoken with Jane, had not reviewed any police reports specific to her case, and was not there to "speak to any facts of this case or any victim in this case." And as we discuss next, the trial court *twice* instructed the jury as to the limited purpose of Shultz's testimony.

On this record, we conclude there is no reasonable probability the jury misunderstood the limitations of Shultz's testimony, or relied on that testimony to conclude the abuse actually occurred. Given the limited nature

of Shultz's testimony and the overwhelming evidence of guilt, we would find any error in permitting the testimony was not prejudicial under either the *Watson* or *Chapman* standard.

B.   *CALCRIM No. 1193 Does Not Misstate the Law*

The trial court instructed the jury twice on the limited purpose of Schultz's testimony.[15]   First, before Schultz took the stand, the court told the jury: Shultz's "testimony about child sexual abuse is not evidence that the defendant committed any of the crimes charged against him.  You are being given this testimony so that you may consider it only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."  Second, after the close of evidence, the trial court repeated the instruction, and informed the jury Shultz's testimony also was not evidence Herrera "committed the uncharged conduct against him involving [Janice]."  The court explained, "[y]ou may consider this evidence only in deciding whether or not [Jane's] and [Janice's] conduct was not inconsistent with the conduct of

_____

[15]   The trial court used CALCRIM No. 1193, the standard limiting instruction that sets forth the permissible uses and limitations for child sexual abuse accommodation syndrome (CSAAS).  It states:  "You have heard testimony from _____ *<insert name of expert>* regarding child sexual abuse accommodation syndrome.  [¶] _____'s *<insert name of expert>* testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged].  [¶] You may consider this evidence only in deciding whether or not _____'s *<insert name of alleged victim of abuse>* conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."  Because Shultz did not refer to CSAAS specifically, the court omitted the words "accommodation syndrome" throughout the instruction.

someone who has been molested and in evaluating the believability of their testimony."

Herrera asserts the trial court's jury instruction on the limited purpose of Shultz's expert testimony was erroneous because it permitted the jury to rely on the Shultz's testimony as evidence of guilt. Herrera concedes he did not object to the limiting instruction in the trial court. In fact, it was defense counsel who first asked the court to instruct the jury with CALCRIM No. 1193. The trial court agreed, and asked the prosecutor to send a copy of the modified instruction to defense counsel before Shultz testified so defense counsel would "have a chance to look at it and see if he has any objection." The court then read the instruction to the jury prior to Shultz's testimony, without objection. Accordingly, any error in giving the instruction or the precise language the trial court used was invited, and Herrera has forfeited this argument on appeal. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 138 ["doctrine of invited error bars a defendant from challenging a jury instruction given by the trial court when the defendant has requested the instruction"]; *People v. Mitchell* (2019) 7 Cal.5th 561, 579 ["because Mitchell failed to object below, his state law claims asserting error on the instructions have been forfeited"]; *People v. Battle* (2011) 198 Cal.App.4th 50, 75 [defendant forfeited argument concerning additional language added to jury instruction by failing to object in the trial court].)

Herrera argues his failure to object did not invite the error or constitute a forfeiture because defense counsel objected to Shultz's testimony in its entirety, and was simply "making the best of a bad situation" by asking for the limiting instruction if the trial court did not exclude the testimony altogether. Still, Herrera could have asked the trial court to alter the

29

language of CALCRIM No. 1193 if he thought it misstated the law, as he now argues on appeal. But he did not.[16]

Herrera further asserts the error was not forfeited because it affected his substantial rights because the instruction misstated the law, and allowed the jury to use Shultz's testimony in an improper manner that lowered the prosecution's burden of proof. (See *People v. Anderson* (1994) 26 Cal.App.4th 1241, 1249 ["the failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant"].) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*Ibid.*) But, here, too, Herrera's assertions have been squarely rejected by other courts. Thus, even if we were to overlook the forfeiture and consider the merits of the claim, we would reject it.

Like Herrera, the defendant in *Munch* asserted "instructing jurors that they may use [expert testimony regarding the reporting of child sex abuse] 'in evaluating the believability' of the child's testimony means they will improperly use it to find the defendant is guilty." (*Munch, supra,* 52 Cal.App.5th at p. 474.) In rejecting the argument, the court explained: " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the

_____

16    At most, when discussing the final jury instructions at the close of evidence, defense counsel noted, "my ongoing concern with this instruction, in general, is the use of the double language." But, again, he did not object to the court giving the instruction, or propose any revised or different language.

30

child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Ibid.,* quoting *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*).) We agree with that analysis, and likewise conclude the language of CALCRIM No. 1193 does not misstate the law.

Herrera asserts the *Munch* analysis is not convincing, because neither *Munch* nor *Gonzales* directly addressed the phrase "was not inconsistent with," which he contends is a confusing double negative and the "most problematic" portion of the instruction. Not so. As the court in *Gonzales* noted, the jury there was instructed: " 'You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.' " (*Gonzales, supra,* 16 Cal.App.5th at p. 503.) Like here, the defendant argued the instruction was "inconsistent" and there was no way for the jury to use the evidence to evaluate the victim's credibility without using it to determine guilt. (*Ibid.*) The court considered the totality of the instruction, including the "not inconsistent" language when it rejected that argument. (*Id.* at pp. 503–504.)

Still, we independently conclude the "not inconsistent" language in the instruction was not misleading or inconsistent with the law. We consider the instruction in the context of the entire record, including Shultz's testimony,

and presume the jury understood and followed the instruction. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1335 [" 'It is well established that [a jury] instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole *and the trial record.*' "]; *People v. Martinez* (2010) 47 Cal.4th 911, 957.) Here, the court began by explicitly telling the jury Shultz's testimony was not evidence Herrera committed any crime. Only after that statement did the court explain that the jury *could* consider the evidence to determine whether Jane and Janice were believable, and, specifically, whether their conduct was "not inconsistent with" someone who had been molested. Shultz testified consistent with the court's instruction. She explained she was not there to tell the jury to believe anyone, or even what to look for in determining whether a particular witness was credible. She explained further that there was nothing in her experience or the studies she discussed that would allow her to determine whether a child's allegation of abuse was truthful.

On this record, we conclude the limiting instruction the trial court gave was both comprehensible and consistent with the law. (See *McAlpin, supra,* 53 Cal.3d at pp. 1300–1301 [concluding such expert testimony is admissible for the limited purpose of rehabilitating a victim's credibility].) But for these same reasons and those we have already discussed (see section II.D., *ante*), we would also conclude any error in the trial court's limiting instruction on Shultz's testimony was harmless under either the *Watson* or *Chapman* standard of prejudice.

32

## III.

*The Matter Must Be Remanded for Resentencing Under Senate Bill No. 567*

The trial court sentenced Herrera to the upper term of eight years on count 1, oral copulation of a person under 14 (§ 288, subd. (c)(1)). The court also imposed the upper term on count 2, lewd act upon a child (§ 288, subd. (j)), but stayed the sentence pursuant to section 654. The court explained, "I think the overarching factor in aggravation is that [Herrera] took advantage of a position of trust to commit the offense. This was his stepdaughter. He was supposed to protect her from harm from the rest of the world, not victimize her. And even though normally being 76 years old and not having a prior criminal record would overcome pretty much any factor in aggravation, in this particular case I don't find it to do so. I think the position of trust that he abused to continually molest [Jane] overwhelms that factor in mitigation, and therefore I do find for Count 1 the appropriate term would be the upper term of eight years."

At the time Herrera was sentenced, section 1170, former subdivision (b), left it to the sentencing judge's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.) This is no longer the case. As amended by Senate Bill 567, new section 1170, subdivision (b), effective January 1, 2022, provides that a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

As the parties agree, the amendments to section 1170, subdivision (b), effected by Senate Bill 567 are ameliorative and apply retroactively to Herrera's case, which was not final on the enactment's operative date, under the *Estrada* rule. (See *In re Estrada* (1965) 63 Cal.2d 740; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*) ["The People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022."].)

The People further concede the matter must be remanded to the trial court for resentencing under the current version of section 1170, subdivision (b). The concession is proper. The aggravating factors relied on by the trial court in imposing the upper term sentences were neither admitted nor found to be true beyond a reasonable doubt. Thus, the trial court did not comply with the requirements of the newly amended section 1170, subdivision (b), in selecting the upper terms for counts 1 and 2, and the matter must be remanded for further proceedings.

The Attorney General asserts the People should be given be an opportunity to comply with the new requirements of section 1170, subdivision (b). We agree. "On remand, the People may elect to proceed under the requirements of the newly-amended version of section 1170, subdivision (b), which would permit the People to prove the existence of aggravating factors beyond a reasonable doubt to a jury, unless the defendant waives the right to a jury and agrees to have the factors decided by the court beyond a reasonable doubt; alternatively, the People may accept resentencing on the record as it stands." (*Lopez, supra,* 78 Cal.App.5th at p. 468.)

## DISPOSITION

The sentence is vacated and the matter is remanded for resentencing in accordance with the current version of section 1170, subdivision (b).  In all other respects, the judgment is affirmed.

DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.